IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VICTORIA CHARITY WHITE, ) | |
| ) | |
|     *Plaintiff*, ) | |
| ) | |
| ) | |
|     v. ) | C.A. No. 24-cv-00018 (CJN) |
| ) | |
| ) | |
| JASON BAGSHAW, *et al.*, ) | |
| ) | |
|     *Defendants*. ) | |
| _____) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
ON THE PLEADINGS ON THE GROUNDS OF QUALIFIED IMMUNITY**

**INTRODUCTION**

    Plaintiff, Victoria Charity White, hereby files this opposition to Defendants Commander Jason Bagshaw and Office Neil McAllister's Motion for Judgment on the Pleadings on the Grounds of Qualified Immunity under Fed. R. Civ. P. 12(c). A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial. . ." Fed. R. Civ. P. 12(c). Plaintiff filed her Amended Complaint on March 27, 2024 (ECF 6). The Defendants have yet to file their Answer, so the pleadings are not closed. Accordingly, the Court must accept as true the well pleaded allegations of fact in her complaint, which have not been denied by the Defendants. *Ndondji v. InterPark Inc.,* 768 F. Supp. 2d 263, 271 (D.D.C. 2011) (the plaintiff's factual allegations "must be presumed true and should be liberally construed in his or her favor.").

    As will be demonstrated, the Defendants are not entitled to qualified immunity as a matter of law for the brutal beatings they inflicted on Ms. White, who posed no threat to them

1

or the other officers, when she was seized by them inside the Capitol Building's West Tunnel entrance on January 6, 2021, and trapped by a phalanx of some 40 Metropolitan Police Officers in riot gear.  It was clearly established by both case law as well as by the Metropolitan Police Department's Use of Force policy that a reasonable officer would know that repeatedly beating her over the head with a metal baton, repeatedly punching her in the face, and slamming her into the concrete of the tunnel wall for some five minutes when she posed no threat was a prohibited use of force.  At a minimum, a reasonable jury could resolve any issue of fact and conclude that the Defendants are not entitled to qualified immunity.

**FACTUAL ALLEGATIONS**

That following are the salient allegations by paragraph number in the Amended Complaint that are to be presumed true and liberally construed in the Plaintiff's favor:

11.     On January 6, 2021, Ms. White attended the rally on the Ellipse where President Donald Trump spoke and exercised her right under the First Amendment to peacefully assemble and protest. She did not bring or carry any weapons.

12.     White subsequently left the Ellipse and peacefully marched to the Capitol Grounds with other rally goers.

13.     The U.S. Capitol Police had issued six (6) permits for six (6) different demonstrations on the grounds of the U.S. Capitol that were to be held on January 6, 2021 throughout the day.

14.     At the time Ms. White arrived at the Capitol Grounds, she did not see any signs restricting the public from this otherwise public area.

15.     The following facts occurred at the times noted on video recordings linked below that were under seal until the Government was forced to release it by order of this Court and are now in the public domain.

16.     Plaintiff is seen on video on the side entrance steps to the Capitol wearing a red MAGA hat, a red top, and a flag/banner wrapped around her shoulders confronting and yelling at the protestors not to break any windows or enter the Capitol or cause a disruption. * * * *  Ms. White is seen pulling a male protestor down from a window which he was attempting to smash, and at the 1:28 minute mark, telling him to "Get the f*** out of here!".

17. Shortly thereafter, White is pushed by the crowd into the nearby Lower West Terrace Tunnel entrance to the Capitol building, where a phalanx of some 40 officers in riot gear stood shoulder-to-shoulder against the tunnel walls, approximately five officers abreast and seven rows deep. The following unlawful excessive force by the Defendants took place then and there as shown on this five-minute video: https://rumble.com/vr9uhp-brutal-victoria-white-pummeled-by-police-officers-on-jan.-6.html

20. Lieutenant Bagshaw, on the right side of the tunnel, is wearing a white shirt unlike the other officers dressed in black riot gear These events occurred around 4:00 p.m. ET on January 6. 2021, long after the Capitol was first breached around 1:30 pm and well after it was put into lockdown at 2:20 pm when Members were taken to safe quarters.

:05    Bagshaw reaches over his fellow officers and violently strikes Ms. White in the head with his baton five times in seven seconds. The first blow knocks her MAGA hat off her head.

:13    Bagshaw hits Ms. White over the head two times and then spears her with the baton two times.

:14    Ms. White is sprayed directly in the face with mace by an officer standing on ledge. Ms. White pleads with him to stop.

:25    Ms. White is maced and hit by Bagshaw and ledge officer.

:38    Ms. White is visibly bleeding from her head, which can be seen from her blood having been transferred on the white hoody of the protestor pushed up next to her.

:45    Ms. White is stuck in the crush surrounding officers and cannot go anywhere.

:49    Ms. White is struck seven more times by Bagshaw and another MPDC Officer pulls White's hair back and forth.

1:11    Bagshaw moves his way from behind his fellow officers towards Ms. White to get a better striking distance and begins another assault. He spears and pokes White with his baton about the head, neck, and face to inflict maximum pain. Ledge Officer sprays mace on Ms. White.

2:05    Bagshaw beats Ms. White with his baton striking directly over the head another two times and then punches White with his fist.

2:09    Another MPDC Officer holds White and prevents her from leaving.

2:34    Bagshaw hits/spears Ms. White eight more times.

3:02    Bagshaw punches Ms. White in the face, with his left-hand, landing five punches in five seconds, with all of his might, while she is being held by another officer.

    3:30    Another officer joins in and starts beating Ms. White in the head with his baton, landing twelve strikes directly to her face;

    3:42    Ms. White is visibly in distress.

    4:00    Ms. White collapses twice after being tossed around like a rag doll 4:52. Bagshaw attacks Ms. White as she tries to flee striking her in the face with his baton three times.

    VIDEO ENDS

21.  At no time did Ms. White hit, strike, or spit on any Defendants or other officers or threaten to do so. She was completely defenseless. Standing at five feet, six inches and weighing 137 pounds, she was no match for the much taller and heavier Bagshaw and his officers.

27.  The five-minute video above did not contain any audio nor did it show close-up shots of Ms. White being mercilessly beaten and pummeled by the Defendants and other officers.

28.  However, the following professional documentary in which Ms. White is interviewed about her encounter at the Capitol and her personal history, graphically demonstrates both the unlawful conduct of the Defendants in greater detail in both audio and video using bodycam footage belonging to the Defendants and other officers, and the physical and emotional pain they inflicted on her: Lara Logan | "The Rest of the Story" | What Are They Still Hiding About January 6th? | Victoria Charity White (2024) ("Logan Video").
https://x.com/laralogan/status/1743731262118940702

29.  As shown in the video and alleged herein, the Defendants present on the scene physically and unlawfully beat Ms. White using excessive and deadly force and knew that she could not retreat from their repeated assault and battery upon her because of the crush of the crowd behind her outside of the arched tunnel entrance.

4



30.     The Logan Video shows Defendant McAllister slamming Ms. White up against the concrete tunnel wall, whereupon, inexplicably, his bodycam is shut off for some 30 seconds. Logan Video at 4:44.

31.     During the Defendants' attack on Ms. White, one male protester near the tunnel entrance pleaded with the Defendants, shouting: "No, no, no, no. Please… Please don't beat her!" Logan Video at the 17:18 minute mark. The Defendants ignored his plea and resumed beating Ms. White.

### II. PLAINTIFF WAS SEIZED FOR PURPOSES OF THE FOURTH AMENDMENT

To determine whether there was an "unreasonable seizure" under the Fourth Amendment, it must first be determined whether a seizure took place. Defendants' argument that the Plaintiff has not alleged a seizure of her person is wholly without merit. Specifically, a seizure "requires the use of force with intent to restrain" even if the person does not submit and is not subdued. *Torres v. Madrid*, 592 U.S. 306, 317 (2021). Even a momentary limitation of a person's freedom is a seizure if it results from means intentionally applied. *See, e.g., Kyle v.*

5

*Bedlion,* 177 F. Supp. 3d 380 at 390-92 (D.D.C. 2016) (partygoer seized when she was shoved into a barbeque by police officer, because "a seizure can be accomplished in an instant, and there is no minimum time that a plaintiff's freedom of movement must be terminated in order to establish that a seizure has occurred" (citation and internal quotation marks omitted)).[1]

The allegations in Ms. White's Amended Complaint, including the two videos, clearly show that once she crossed the police line and entered the West Terrace tunnel, she was engulfed in a phalanx of some 40 police officers packed inside the tunnel standing shoulder to shoulder that included the Defendants. Her freedom of movement was nonexistent or severely limited, she could not exit the tunnel once being pushed behind a row of officers at the entrance of the tunnel, and thus she was seized or at least in the process of being seized. *Ndondji v. InterPark Inc.,* 768 F. Supp. 2d 263, 271 (D.D.C. 2011) (the plaintiff's factual allegations "must be presumed true and should be liberally construed in his or her favor.").

Once Bagshaw reached over the officers in front of him and started beating Ms. White on her head and shoulders repeatedly with his metal baton and punching her in the face, and when McAllister slammed her against the tunnel wall, as well as her being sprayed with a chemical irritant, she was undoubtedly seized as they "inten[ded] to restrain" her, and succeeded in doing so. See *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("The

---

[1] Other circuits agree. *Slusher v. Carson*, 540 F.3d 449, 452, 454-55 (6th Cir. 2008) (holding that an officer seized the plaintiff when he momentarily grabbed her hand to retrieve a paper she was holding); *Atkinson v. City of Mountain View,* 709 F.3d 1201, 1208-09 (8th Cir. 2013) (where officer's "bull rush" knocked subject ten to fifteen feet backward, "a seizure occurred the moment [the officer] charged into [the subject]"); *Nelson v. City of Davis*, 685 F.3d 867, 875-76 (9th Cir. 2012) (person rendered temporarily "immobile" by a projectile filled with pepper spray was seized); *Acevedo v. Canterbury*, 457 F.3d 721, 723-25 (7th Cir. 2006) (subject seized by single punch that caused him to fall, in spite of the fact that he got back to his feet; "[t]he fact that the restraint on the individual's freedom of movement is brief makes no difference").

complaint here sufficiently alleges that respondents, under color of law, sought to stop [Ms. White] by means of a [police line], and succeeded in doing so. That is enough to constitute a "seizure" within the meaning of the Fourth Amendment.").

### A. The *Ferris* Case is Clearly Distinguishable.

The Defendants' principal reliance on *Ferris v. District of Columbia*, No. 1:23-CV-481-RCL, 2023 WL 8697854, at *9 (D.D.C. Dec. 15, 2023) for the proposition that no seizure of Ms. White took place is clearly distinguishable from the facts in this case:

> In *Ferris*, the plaintiffs alleged that Metropolitan Police Department (MPD) officers "deployed harmful, indiscriminate 'less lethal' munitions" against protestors during the Summer 2020 protests after the murder of George Floyd. *Id.* at *1. The court dismissed their Fourth Amendment claims, finding that the facts alleged did not sufficiently demonstrate an objective intent to restrain. *Id.* at *9–*11. There was an "obvious alternative explanation" for the officers' conduct: "the officers sought to *disperse*, rather than restrain, the protestors." *Id. a*t *9. (emphasis in original).
> So too here, even taken as true, White presents allegations of Commander Bagshaw and Officer McAllister having sought to disperse and repel protestors, including White, to prevent them from entering the Lower West Terrace Tunnel entrance to the United States Capitol…. Def. Mot. at 6-7.

Not so. White clearly did *not* allege that Bagshaw and McAllister "sought to disperse and repel…White to prevent [her] from *entering* the Lower West Terrace Tunnel entrance to the United States Capitol." (emphasis added). Instead, as White clearly alleges, and the videos clearly show, she had *already entered* the tunnel entrance. Once inside, the Defendants did not seek to "disperse and repel" her from "entering" the tunnel but instead seized her by pummeling her with blows over her head, landing punches to her face, and slamming her into the tunnel wall. The allegations and videos thus clearly demonstrate that there was an "objective intent to restrain" her.[2]

---

[2] And even when officers are dispersing a crowd, a "seizure" can still be found to have taken place depending on the force used and its impact on a member of the crowd. *See, e.g.,*

7

If this Court were to rule that the allegations, seen in the light most favorable to the Plaintiff, do not constitute a "seizure" under Fourth Amendment, and that no reasonable jury would find that White was seized or detained, that would mean Bagshaw and McAllister could have continued striking her over the head with a metal baton inside the tunnel and slamming her against the tunnel wall until she perished. Indeed, such a fatal outcome was the expressed desire of Officer McAllister as seen in the video White provided in her amended complaint:

> 41. Defendant McAllister's disregard of the Use of Force Framework is reflected on bodycam footage where, before the attack on Ms. White occurred, he is heard saying, "I don't know why they [police officers] are not just going Full Monty on these MFers" and "So they're breaking into the Capitol and they're not shooting them?" Logan Video at 22:31.

Thus, if the Court should rule that no seizure occurred, the Court should construe Plaintiff's allegations as a due process violation of the Fifth Amendment under Section 1983 because they are couched in Fifth Amendment terms in the Amended Complaint:

> 38. The Defendants willfully and unlawfully seized Plaintiff by means of objectively unreasonable, excessive, and indeed, deadly force that shocks the conscience, thereby unreasonably restraining and depriving Plaintiff of her freedom and inflicting physical and mental harm and anguish. Accordingly, they are not entitled to qualified immunity for their actions.
> 39. None of the Defendants engaged in reasonable steps to protect Plaintiff from the objectively unreasonable and conscience-shocking excessive force, which they were required to do.
> 40. They are therefore, each and every one of them, liable for the injuries and damages resulting from the objectively unreasonable and conscience-shocking force committed by each one separately and in concert.

Alternatively, leave to amend the Complaint should be granted to allege a Fifth Amendment violation.[3]

---

*Nelson v. City of Davis*, 685 F.3d 867 at 873, 878 (9th Cir. 2012) (finding a seizure when police officer shot plaintiff in the eye with a pepperball projectile as part of an effort to disperse a crowd); *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't,* 466 F. Supp. 3d 1206 (W.D. Wash. 2020) (finding excessive force when police fired a projective weapon into an unruly crowd and struck plaintiff).

[3] *See Norris v. District of Columbia*, 737 F.2d 1148, 1150 (D.C. Cir. 1984) (due process claim for use of excessive force is evaluated considering "the need for the application of force,

8

### III. BOTH DEFENDANTS VIOLATED A CLEARLY ESTABLISHED RIGHT

White has made sufficient allegations, buttressed by the two videos of the incident, showing both defendants using excessive and deadly force against her, that a reasonable jury could find violated a clearly established right that would be clear to a reasonable member of the police force.

The Defendants mistakenly caption their heading in this part of the qualified immunity analysis as "**C. Neither Defendant Knowingly Violated a Clearly Established Right**" Def. Mot. at10. The subjective knowledge of a defendant in violating the clearly established right is not the test of whether they are entitled to qualified immunity. To be sure, a knowing violation may very well be proved in this case, justifying the award of punitive damages. Rather, a plaintiff need only show that the Defendants' use of force was *objectively* unreasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 399 (1989).

In *Graham,* the Supreme Court outlined three factors that guide the objective reasonableness analysis: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. In the instant case, White, who was unarmed, admittedly trespassed when she crossed over the entrance to the West Terrace tunnel, which is a non-violent crime. As for the second and third *Graham* factors, she was a passive resister who posed no "immediate threat to the safety of

---

the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline *or maliciously and sadistically for the very purpose of causing harm.*" ) (emphasis added).

the officers or others," nor was she "actively resisting arrest or attempting to evade arrest by flight."

In weighing the three factors in the context of a Black Lives Matter protest in Denver, the Tenth Circuit found that the "second *Graham* factor, 'undoubtedly the most important,' *Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) (internal quotation marks, citation omitted), asks whether the facts, viewed in the light most favorable to the non-movant, support a finding that the Plaintiffs here posed an immediate threat to the safety of officers or others." *Packard v. Budja*, 86 F.4th 859 (10th Cir. 2023). The court of appeals sustained the district court's denial of qualified immunity to the officers who injured the plaintiffs using non-lethal force to disperse the crowd. *Id*. at 867. After reviewing other protest cases, the court concluded that "[b]y May of 2020, when the incidents here occurred, it had been clearly established for (at least) twelve years that the deployment of less-lethal munitions on an unthreatening protester who is neither committing a serious offense nor seeking to flee is unconstitutionally excessive force." *Id*. at 871.

### A. The *Fischer* Case is Distinguishable from This Case.

The Defendants principally rely on the recent decision in *Fischer v. District of Columbia*, No. 24-cv-00044 (CRC), 2025 WL 894445 (D.D.C. Mar. 24, 2025), another January 6 protest case, where the plaintiffs alleged a Fourth Amendment violation by the police for using chemical spray and other non-lethal force to disperse the protestors. Def. Mot. at 9. That case is distinguishable in material respects from the instant case.

In the first place, the *Fischer* court found that no claim was made that there was a "seizure' under the Fourth Amendment since the conduct of the police was to disperse the crowd. The court admittedly ruled that "even if the complaint could be construed to state such

a claim, given the unprecedented circumstances surrounding the violent encroachment of the U.S. Capitol, Fischer has not demonstrated that every reasonable official would have understood the MPD officers' conduct to violate the Fourth Amendment. Accordingly, they are entitled to qualified immunity on this claim." *Id*. at *15.

However, a closer look at the "unprecedented circumstances" and the officers' conduct cited in the *Fischer* case compared to those in the instant case could lead a reasonable jury to conclude that a reasonable official would have understood that beating an unarmed and defenseless woman repeatedly over the head with a metal baton and drawing blood, punching her several times in the face, and slamming her against the concrete tunnel wall, violated the Fourth Amendment prohibition against unreasonable and excessive force. As for the "unprecedented circumstances" described in the *Fischer* case, the court stated:

> Given that, as Fischer acknowledges, <u>members of Congress were actively engaged in certifying election results and that government officials were present in a confined area within the U.S. Capitol,</u> the risk of violence or disruption was both foreseeable and substantial. Common sense dictates that such circumstances create a heightened security concern, warranting immediate and decisive action by law enforcement <u>to safeguard officials</u> and maintain public order. Therefore, under established precedent, the MPD officers' actions <u>to contain or disperse</u> the protest were patently <u>justified by the government's compelling interest in ensuring the safety of its officials</u> during a constitutionally mandated proceeding.

*Id*. at *20 (citation modified) (emphasis added). Def. Mot. at 10. While Fischer may have acknowledged that "members of Congress were actively engaged in certifying the election results," that clearly was not the situation at the time that White entered the tunnel at approximately 4:00 p.m. "These events occurred around 4:00 p.m. ET on January 6. 2021, long after the Capitol was first breached around 1:30 pm and well after it was put into lockdown at 2:20 pm when Members were taken to safe quarters." Am. Compl., ¶20. The Court can also

11

take judicial notice that Congress began to meet in joint session to confirm the election results at 1:05 p.m. At 1:11 p.m. MPD officers arrived at lower west plaza to confront rioters approaching the Capitol. At 2:13 p.m., protestors first breached the Capitol Building by smashing windows on the Senate side. Vice President Pence was immediately removed from the Senate chamber by his lead Secret Service agent and the Senate was gaveled into recess. Shortly thereafter, Speaker of the House Nancy Pelosi was also moved to a secure location. By 2:29 p.m., the House was in recess and members and their staff left their respective chambers to seek secure locations for their safety.[4]

Accordingly, at the time of White's presence in the tunnel at 4:00 p.m., it was approximately one and half hours *after* the Congress paused their certification of the election and *after* members sought safe and secured location. Defendant Bagshaw, the lieutenant in charge of the 40 or so riot police in the tunnel, likely knew at that time (and which can be confirmed with discovery) that the safety of the government officials was not of paramount concern. In any event, it was apparent to any reasonable officer that using deadly force with repeated baton blows to the head of a defenseless and non-threatening protestor trapped in a tunnel and surrounded by 40 officers and slamming her against the tunnel wall clearly violated her Fourth Amendment rights.

Indeed, as alleged in Plaintiff's Am. Compl., ¶34, it is against MPD policy, MPD GO-RAR-901.07 (Use of Force), to use such deadly force, including "a strike to the head with a hard object" of a "passive resister" such as Ms. White.

---

[4] https://en.wikipedia.org/wiki/Timeline_of_the_January_6_United_States_Capitol_attack

**MPD USE OF FORCE FRAMEWORK**

| Category of Perceived Threat | | Force Response |
|---|---|---|
| Passive Resister | Subject displays a low level of noncompliant, passive resistance. Noncompliance offers no physical or mechanical energy. Subject does not respond to the member's lawful requests or commands and may be argumentative. | **Control Holds** Low-level physical tactics to gain control and cooperation (examples include soft empty hand controls, leaning on a subject's legs to hold them down, and firm grip). |
| Active Resister | Subject is uncooperative and will not comply with member's requests or commands. Subject exhibits physical and mechanical defiance or behaves in such a way that causes the member to believe that subject may be armed with a weapon, including evasive movements to defeat member's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention not to be held in custody, provided that the intent to resist has been clearly manifested. | **Compliance Techniques** Actions that may induce pain or cause discomfort to the subject who is actively resisting until control is achieved, but will not generally cause an injury when used in accordance with department training and standards. Examples include oleoresin capsicum (OC) spray, wrist locks, takedowns, ASP baton arm extractions, use of an ASP baton to conduct a wrist lock, and use of a patrol shield to pin a subject down. |
| Threatening Assailant | Subject has gone beyond the level of simple non-cooperativeness, and is actively and aggressively assaulting (e.g., striking, kicking) the member, themselves, or others, or the threat of an aggressive assault is imminent. Subject has demonstrated a lack of concern for the member's safety; however, subject does not pose an imminent threat of death or serious bodily injury to member or others. | **Defensive Tactics** All force options other than deadly force. Although a range of force options are generally available, members shall adhere to policy requirements governing the use of specific force options and less lethal weapons. Defensive tactics are employed to forcibly render the subject into submission; however, these actions are not likely nor designed to cause death or serious bodily injury. Defensive tactics are primarily used to ensure the safety of the member and others [examples include strikes, ASP baton strikes, use of a police mountain bike as an impact weapon, electronic control devices (ECDs), and 40mm extended impact weapons in accordance with department training and standards]. |
| Active Assailant | Subject poses an imminent danger of death or serious bodily injury to member or another person (other than the subject). Subject's actions demonstrate subject's intent to inflict imminent death or serious bodily injury upon member or another person. | **Deadly Force** All force options. Deadly force shall only be used if the member reasonably believes that deadly force is immediately necessary to protect the member or another person (other than the subject of the use of deadly force) from the threat of serious bodily injury or death, the member's actions are reasonable given the totality of the circumstances, and all other options have been exhausted or do not reasonably lend themselves to the circumstances (examples include the use of a firearm or a strike to the head with a hard object). |

Source: MPD GO-RAR-901.07 (Use of Force), effective date January 1, 2022

*See also* **Metropolitan Police Department** Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstration (Revised July 3, 2013):[5]

> **Appendix K-5**
> **Deadly Force:** Any use of force likely to cause death or serious physical injury, including but not limited to the use of a firearm or a strike to the head with a hard object. Deadly force must be employed in accordance with GO-RAR – 901.07 (Use of Force)
> **Appendix K-10**

---

[5] https://go.mpdconline.com/go/sop_11_01.pdf

13

> *Mechanical Force* with Riot batons – When holding the riot baton members shall always:
> ***
> 3. Ensure strikes are NOT made to the head or other vital area (capitals in original).

Accordingly, it was abundantly clear to all reasonable officers, and especially to Commander Bagshaw who was the supervisory officer in charge at the time (and thus liable under Count II for supervisory responsibility), that the MPD's long established Use of Force policy prohibited the excessive and deadly force against a "passive resister" such as White, who presented the lowest level of a "perceived threat" to the officers and others.  The Defendants' failure to even address these clear restrictions on their use of force in their motion is an admission of their culpability.  The requirement that there be a "clearly established" court decision prohibiting the excessive force complained of is designed to put the officers on notice what use of force they may wield against citizens in particular circumstances.  Police officers are unlikely to pour over numerous court decisions in their off-duty time to educate themselves of what level of force they may use in various circumstances.[6]  On the other hand, their training manuals, such as those here, give fair notice and guidance regarding the use of force, which a jury could consider in determining whether they are entitled to qualified immunity. It simply will not do to describe in general terms the "unprecedented circumstances surrounding the violent encroachment of the United States Capitol" (Def.  Mot. at 12) without examining the circumstances that existed inside the West Terrace tunnel at the time a defenseless and unthreatening plaintiff was mercilessly pummeled by the defendants.

---

[6] *See* Joanna C. Schwartz, *"Qualified Immunity's Boldest Lie,"* 88 Univ. of Chicago L. Rev. 605 (2021) (describing the impracticality of educating officers on all the court cases on qualified immunity).

**CONCLUSION**

For the foregoing reasons and the undisputed factual allegations in Plaintiff's Amended Complaint, the Court should deny the Defendants' Motion for Judgment on the Pleadings on the Grounds of Qualified Immunity and order them to file an Answer to the complaint within 20 days.

Date: July 15, 2025                    Respectfully submitted,

*/s/ Paul D. Kamenar*
Paul D. Kamenar, D.C. Bar No. 914200
1629 K Street, N.W., Suite 300
Washington, D.C. 20006
paul.kamenar@gmail.com
301-257-9435

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing response was served via ECF on all counsel for the defendants this 15th day of July, 2025.

*/s/Paul D. Kamenar*